UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

RAYTHEON COMPANY                                                    Plaintiff

v.                                                          Civil Action No. 3:21-cv-00239

AHTNA SUPPORT AND TRAINING                                        Defendants
SERVICES, LLC; AHTNA NETIYE', LLC;
AHTNA, INCORPORATED; THOMAS M.
OWENS

\* \* \* \* \*

## MEMORANDUM OPINION & ORDER

Third-Party Defendant Saft America, Inc. ("Saft") moves to exclude Dr. Tal Nagourney ("Dr. Nagourney") [DE 144], and for summary judgment. [DE 145]. Third-Party Plaintiff Ahtna Support and Training Services, LLC ("Ahtna") responded [DE 190; DE 193], and Saft replied [DE 216; DE 217]. These matters are ripe. For the reasons below, Saft's Motion to Exclude Testimony [DE 144] is **DENIED** and Saft's Motion for Summary Judgment [DE 145] is **GRANTED**. Third-party defendant Saft is dismissed as a party as no claims remain pending against them.

## I.     BACKGROUND

Raytheon is a contractor of aerospace and military defense equipment that operates a warehouse in Fairdale, Kentucky. [DE 1 at 1-3]. At their Fairdale location Raytheon maintains, stores, and services multiple mobile charging stations and storage locations for lithium-ion battery boxes ("LBBs"). [*Id.* at 3]. The LBB's were designed and manufactured by Saft but owned by the government pursuant to military contracts. *Id*. Each LBB was stored within specially designed trailers commonly referred to as vaults. [DE 144 at 1006].

At issue in this case is Vault #2 which comprised an explosion proof container mounted on a tow trailer with shelves on each side containing LBBs connected to chargers. [DE 1 at 4]. Vault

1

#2 was located on a loading dock at the Fairdale warehouse. *Id*. Ahtna agreed to provide qualified sustainment services and other necessary support to Raytheon, which included management and oversight of Vault #2. [*Id*. at 6].

On or about April 15, 2020, an over-heating ("exothermic") event occurred in Vault #2 at the Fairdale facility ("April Event"). [DE 144 at 1006]. Two military-grade LBBs overheated for unknown reasons. [*Id*.]. Two LBBs suffered severe damage, and adjacent LBBs experienced minor secondary damage to. [DE 1 at 6]. All the LBBs in Vault #2, including those damaged, remained stable. [*Id*.]. On May 8, 2020, representatives from Raytheon, Ahtna, and Saft formed a Failure investigation team ("FIT") and met to discuss safe removal of the two severely damaged LBBs which had melted to the floor of Vault #2. [DE 150 at 3798]. At this meeting Ahtna field engineer Thomas M. Owens ("Owens") suggested using a sledgehammer and crowbar to peel the melted batteries from the floor, but his idea was rejected as unsafe. *Id*. Ahtna was instructed not to touch the batteries by multiple members of the FIT team at the meeting. [*Id*.].

On May 13, 2020, Owens and two other Ahtna engineers, David Metcalfe and Greg Hart, arrived at Vault #2 with instructions to take photographs of the damaged LBBs ("May Event"). [*Id*. at 7]. Instead, on their own volition, using a sledgehammer and pry-bar, they began removing the two LBB's from the floor of the vault where they had melted and fused. [*Id*.]. After removing the first LBB, Owens and the other employees left for lunch, and returned to remove the second LBB. [*Id*.]. During their attempted removal, the second LBB began to emit sparks and smoke, before catching fire in a "thermal runaway event." [*Id*.]. The event spread to other LBBs in a "cascading thermal runaway." [*Id*.].

Vault #2 contained a high-pressure carbon dioxide fire suppression system maintained by Koorsen. [DE 150 at 3798]. Koorsen tested and inspected the Vault #2 fire system periodically,

most recently on December 19, 2019, 5 months prior to the incident in May 2020. *Id* at 3799. The fire system failed to suppress the fire, and the Fairdale Fire Department responded. [DE 1 at 8]. The Fairdale Fire Department suppressed the fire inside the vault before it reignited early the next morning, five hours after the firefighters left. [*Id.*] After returning to the warehouse, the Fairdale fire department decided the fire could not be safely suppressed and removed the vault away from other structures to burn itself out. [*Id.*].

Raytheon claims the complete loss of 304 LBBs, Vault #2 itself, and $2,700,000 in fire-related damages and remediation costs. [*Id.*]. Raytheon alleges four counts against Ahtna; Count I breach of contract, Count II Negligence, Count III Gross Negligence, and Count IV negligent training. [DE 1 at 9-16]. Raytheon also seeks declaratory judgment. [*Id.* at 16]. Ahtna, acting as a third-party plaintiff, brings claims of indemnity against Koorson and Saft as third-party defendants. [DE 70 at 480]. Saft designs, manufactures, supplies, and services the LBBs at the Raytheon's warehouse in Fairdale. [*Id.*]. Doctor Tal Nagourney ("Dr. Nagourney") is Ahtna's expert witness in LBB design. [DE 193 at 7897]. In his opinion Dr. Nagourney discusses the LBB failures that occurred in April 2020, and how that incident relates to the fires in May 2020. [*Id.* at 7898]. Dr. Nagourney also offers a supplemental report to rebut the opinions of Doctor Jason Sutula ("Dr. Sutula"). [*Id.*]. Saft moves to exclude Dr. Nagourney's testimony as unreliable [DE 144] and moves for summary judgment [DE 145].

## II.     ANALYSIS

### A.     Saft's Motion to Exclude Testimony [DE 144]

3

Because Saft's Motion to Exclude Dr. Nagourney [DE 144] has a bearing on the resolution of Saft's Motion for Summary Judgment [DE 145], the Court will first analyze the Motion to Exclude. Saft argues that Dr. Nagourney's testimony should be excluded as unreliable because it fails to satisfy Federal Rule of Evidence 702 and the standards adopted in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, (1993), and his supplemental report is inadmissible as it is merely vouching for the findings of another expert.[1]

**1. Standard**

The admissibility of expert testimony is set forth in Federal Rule of Evidence  702 which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

In *Daubert,* "the Supreme Court established a general gatekeeping obligation for trial courts to exclude from trial expert testimony that is unreliable and irrelevant."  509 U.S. at 597; *see also Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 792 (6th Cir. 2002) (alteration and internal quotation marks omitted).

> Under Rule 702 of the Federal Rules of Evidence, a proposed expert's opinion is admissible . . .  if the opinion satisfies three requirements.  First, the witness must be qualified by knowledge, skill, experience, training, or education.  Second, the testimony must be relevant, meaning that it will assist the trier of fact to understand the evidence or to determine a fact in issue.  Third, the testimony must be reliable.

---

[1] Saft withdrew their objection to Dr. Nagourney's supplemental report being untimely [DE 216 at 9477]. As such this Court will not address these arguments.

4

*Burgett v. Troy-Bilt LLC*, 579 F. App'x 372, 376 (6th Cir. 2014) (quoting *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528-29 (6th Cir. 2008)).

The Court does "not consider 'the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question.'" *Id.* (quoting *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994)).  The Court must determine whether the witness is qualified to offer an opinion on the specific area of expertise.  *In re Welding Fume Prods. Liab. Litig.*, No. 1:03-CV-17000, 2005 WL 1868046, at *33 (N.D. Ohio Aug. 8, 2005) ("An expert may be highly qualified to respond to certain questions and to offer certain opinions, but insufficiently qualified to respond to other, related questions, or to opine about other areas of knowledge.").  "Under the Federal Rules of Evidence, the only thing a court should be concerned with in determining the qualifications of an expert is whether the expert's knowledge of the subject matter is such that his opinion will likely assist the trier of fact in arriving at the truth.  The weight of the expert's testimony must be for the trier of fact." *Mannino v. Int'l Mfg. Co.*, 650 F.2d 846, 851 (6th Cir. 1981).

Along with expert qualifications, "[t]he Court must determine whether evidence proffered under Rule 702 'both rests on a reliable foundation and is relevant to the task at hand.'"  *Powell v. Tosh*, 942 F. Supp. 2d 678, 686 (W.D. Ky. 2013), adhered to on denial of reconsideration, No. 5:09-CV-00121-TBR, 2013 WL 1878934 (W.D. Ky. May 3, 2013) (quoting *Daubert*, 509 U.S. at 597). To assist with this determination, the Supreme Court in *Daubert* laid out several factors for the courts to consider. *Daubert*, 509 U.S. at 592–594.  These factors include: "testing, peer review, publication, error rates, the existence and maintenance of standards controlling the technique's operation, and general acceptance in the relevant scientific community." *United States v. Langan*, 263 F.3d 613, 621 (6th Cir.2001) (citing *Daubert,* 509 U.S. at 593–94). The test of reliability is

5

"flexible," and the *Daubert* factors do not constitute a "definitive checklist or test," but may be tailored to the facts of a particular case. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 150 (citing *Daubert,* 509 U.S. at 593).

Courts have "stressed, [] that Daubert's list of specific factors neither necessarily nor exclusively applies to all experts or in every case. . . [i]n some cases . . . the factors may be pertinent, while in other cases the relevant reliability concerns may focus upon personal knowledge or experience." *First Tennessee Bank Nat. Ass'n v. Barreto*, 268 F.3d 319, 335 (6th Cir. 2001) (finding the *Daubert* factors "unhelpful" in a case involving "expert testimony derived largely from [expert's] own practical experiences throughout forty years in the banking industry [because] [o]pinions formed in such a manner do not easily lend themselves to scholarly review or to traditional scientific evaluation") (internal citations omitted). "[W]hether *Daubert's* specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Id*. Where a party challenges the testimony of a proffered expert for insufficient "factual basis, data, principles, methods, or their application . . . the trial judge must determine whether the testimony has a reliable basis in the knowledge and experience of [his or her] discipline." *Kumho Tires*, 526 U.S. at 142 (quoting *Daubert*, 509 U.S. at 592). *Daubert* involves balancing the desire to liberally admit relevant evidence against the necessity of excluding misrepresentative "junk science." *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 176–77 (6th Cir. 2009) (citing *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002)).

## 2. Reliability of Dr. Nagourney's Testimony (Daubert)

### i. *Legal Conclusions and Admissibility of Opinion Evidence*

In his report, Dr. Nagourney states (1) that "[t]he fire in Vault 2 on May 13, 2020 would not have occurred if LBBs 528 and 941 had not experienced exothermic failures one month prior on April 15, 2020" and (2) that "the LBB that ignited the May 13, 2020 fire was one of 14 compromised by the initial exothermic failures of LBBs 528 and 941. Had it not been compromised, the fire would not have occurred." [DE 144-1 at 1055; Nagourney Report at 25 ¶ 1–2]. Saft argues that these opinions are "nothing more than legal conclusions couched as opinion testimony," instructing the jury how they should rule on "but for causation," and therefore are not proper expert testimony. [DE 144 at 1015].

Pursuant to Federal Rule of Evidence 704, "[a]n opinion is not objectionable just because it embraces an ultimate issue," but an expert is not permitted to render legal conclusions. *Univ. of Tennessee Rsch. Found. v. Caelum Biosciences, Inc.*, No. 3:19-CV-508-CEA-DCP, 2024 WL 3266602, at *5 (E.D. Tenn. July 1, 2024). An expert improperly offers a legal conclusion when "he defines the governing legal standard or applies the standard to the facts of the case. *United States v. Melcher*, 672 F. App'x 547, 552 (6th Cir. 2016); *see also Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 317 (6th Cir. 2019) (finding that the expert did not state a legal conclusion because she did not "frame[ ] her opinion in the 'specialized' language of disability discrimination law" and did not "even use the words 'pretext' or 'discrimination' in her report"); *Berry*, 25 F.3d at 1353 (explaining in the context of expert testimony that "[w]e would not allow a fingerprint expert in a criminal case to opine that a defendant was guilty (a legal conclusion), even though we would allow him to opine that the defendant's fingerprint was the only one on the murder weapon (a fact)[, because] . . . [t]he distinction, although subtle, is nonetheless important"); *Torres v. Cnty. of Oakland*, 758 F.2d 147, 151 (6th Cir. 1985) ("The best resolution of this type of problem is to determine whether the terms used by the witness have a

separate, distinct, and specialized meaning in the law different from that present in the vernacular. If they do, exclusion is appropriate." A legal conclusion is not helpful to the jury because it merely instructs the jury in what verdict to reach. *Woods v. Lecureux*, 110 F.3d 1215, 1220 (6th Cir. 1997).

Dr. Nagourney's contested opinions do not qualify as legal conclusions. The opinions do not touch on an ultimate issue of this claim, which is whether the LBBs were defectively designed such that they were the primary cause of the May event. Instead, they merely reflect the expert's belief that the April and May fires in the Vault #2 were connected, not that Saft was responsible for either fire. His opinion does not define any legal standard or apply the facts of this case to any legal standard. *Melcher*, 672 F. App'x at 552. And Dr. Nagourney's opinion lacks any specialized legal language at issue, but instead, uses more scientific phrasing and conclusions such as, "would not have occurred" or "compromised." [DE 144-1 at 1055; Nagourney Report at 25 ¶ 1–2]. These statements made by Dr. Nagourney in his report are proper non-conclusory expert opinion evidence.

### ii.   *Rule 702 Reliability Analysis*

Saft argues that under Fed. R. Evid. 702's "nonexclusive checklist for trial courts to consult in evaluating the reliability of expert testimony," Dr. Nagourney's testimony is unreliable, speculative, and inadmissible. [DE 144 at 1017]. Saft specifically alleges that the opinions were, (1) not tested, (2) not subjected to peer review and publication, (3) has an unknown error rate and unknown community acceptance rate, and (4) are unhelpful to the trier of fact. *Id*. Ahtna responds that Dr. Nagourney is a reliable witness under Fed. R. Evid. 702, and that none of the factors listed by Saft are dispositive regarding the reliability of his testimony. [DE 193 at 7899].

### a.   *Lack of testing*

There "is no requirement that an expert must physically inspect or test items on which they offer an opinion." *Weidman v. Ford Motor Co.*, 646 F. Supp. 3d 928, 933 (E.D. Mich. 2022). Contrary to Saft's claims, the Sixth Circuit has not held that an expert must test their opinions or physically inspect the items that they offer opinions about. *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 430–32 (6th Cir. 2007). Testing is not an "absolute prerequisite" and is of increased importance when a theory more easily lends itself to testing. *Id.* Under Fed. R. Evid. 703, "an expert's testimony may be formulated by the use of the facts, data and conclusions of other experts*." Asad v. Cont'l Airlines, Inc.*, 314 F. Supp.2d 726, 740 (N.D. Ohio 2004) (citing *Barris v. Bob's Drag Chutes & Safety Equipment, Inc.,* 685 F.2d 94, 102 (3d Cir. 1982)). Experts such as Dr. Nagourney are not required to conduct their own independent testing to support their opinions and can rely on information collected and compiled by others so long as they truly formulate their own opinions. *Id.*

The cases Saft cites to in support of testing as a requirement make clear that testing is just a factor in determining reliability, a factor that can carry more or less weight depending on the circumstances of the expertise and the case. In *Johnson v. Manitowoc Boom Trucks, Inc*, the court adopts the opinion that "hands-on testing is not an absolute prerequisite to the admission of expert testimony," but does take on a heightened importance when the theory or opinion easily lends itself to testing. *Johnson,* 484 F.3d at 430–32. The court also held that the need for testing can be mitigated when an "expert has significant technical expertise in the specific area."

For Dr. Nagourney, the lack of testing is not dispositive of reliability. The facts of this case do not support the need for testing. Dr. Nagourney is a cause of accident expert. He conducted engineering analysis and a fire and explosion investigation using techniques found in NFPA 921, "Guide for Fire and Explosion Investigations." [DE 144-4 at 1200; Nagourney Dep. at 121: 13-

25]. In making his own report Dr. Nagourney relied upon 84 different documents in some form. [DE 144-1 at 1066-69]. This includes numerous incident and failure reports produced by Saft, Ahtna and Raytheon, videos and pictures of the April and May events, and reports and analysis about general hazards concerning LBBs. [*Id*.]. In fact, Dr. Nagourney was unable to perform independent testing of the LBB's as they are government property and requests to conduct an examination were repeatedly denied by the other parties. [DE 193 at 7899; DE 144-1 at 1054; Nagourney Rep. at 24]. Finally, this case is different from those cited by Saft, such as *Johnson*, where testing was deemed a significant factor. In *Johnson*, the expert opined as to alternative designs that he contends were more effective than those at issue in that case. *Johnson,* 484 F.3d 430-32*.* In such cases, testing to validate proposals and designs serves a clear purpose as the expert serves as the creator of the design and is in the best position to conduct testing. Here, not only was Dr. Nagourney prevented from conducting independent testing of the LLBs but given the source and availability of data and information used by Dr. Nagourney in developing his opinion, it is not needed.

b.    *Peer Review and Error Rate*

Saft argues that Dr. Nagourney's opinions are unreliable because "he neither subjected his opinions to peer review nor relied on peer-reviewed literature" [DE 144 at 1019] and his lack of testing led to an "inability to determine whether the known rate of error of his opinions are acceptable nor whether his opinions as a whole are generally accepted by the relevant community." [*Id*. at 1020]. None of this is dispositive in finding an expert's opinion unreliable. *Kumho,* 526 U.S. at 141-42. As established above, witnesses need not perform testing on all their opinions and may rely on more than just published and reviewed articles. Fed. R. Evid. 702. Because Dr. Nagourney's report is a cause of accident report which does not generally require independent

testing, arguments regarding the lack of peer review or known error rates are irrelevant in determining whether the opinion meets the reliability requirement for purposes of admissibility. "[T]he mere fact that the opinion of the proposed expert may not have been subjected to peer review, or that its validity was not confirmed through empirical analysis, does not automatically render that expert's opinion unreliable and thus inadmissible." *Scanlan v. Sunbeam Prod., Inc.,* No. 3:12-cv-9-S, 2015 WL10711206, at *4 (W.D. Ky. Sept. 1, 2015) (citing *United States v. Demjanjuk*, 367 F.3d 623, 634 (6th Cir. 2004)). Analysis of publication, peer review, error rate, and acceptance are all tied to testing. Since this Court has found that testing is not required, or particularly significant, in this case, Dr. Nagourney's testimony is sufficiently reliable without peer review or known error rate.  Those factors are inapplicable here. *SCA Hygiene Prod. Aktiebolag v. First Quality Baby Prod., LLC*, 250 F. Supp. 3d 244, 262 (W.D. Ky. 2017) (citing *Kumho Tire*, 526 U.S. at 141–42)("*Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate determination." (citation omitted)).

           *c.*    *Helpfulness to the Trier of Fact.*

Saft argues that Dr. Nagourney's opinion "will not assist the trier of fact to understand the evidence or determine a fact in issue" for all the reasons previously alleged. [DE 144 at 1021]. Ahtna contends that Dr. Nagourney's reports help the trier understand the technical details of the case and assist the trier of fact in determining whether the LBB's were defectively designed. [DE 193 at 7902]. Ahtna also argues that "any doubts as to whether an expert's testimony would be helpful 'should be resolved in favor of admissibility'[sic]." *Conde v. Velsicol Chemical Corp.*, 804 F. Supp. 972, 997 (S.D. Ohio 1992), aff'd, 24 F.3d 809 (6th Cir. 1994).

Expert testimony is not admissible unless it will be helpful to the fact finder. Under Fed. R. Evid. 702(a) expert evidence is helpful when "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Testimony is unhelpful when it is unreliable or irrelevant, as the Court observed in *Daubert, see id.* at 591–92, and also when it merely deals with a proposition that is not beyond the ken of common knowledge, *see, e.g., Berry,* 25 F.3d at 1350 ("If everyone knows this, then we do not need an expert because the testimony will not 'assist the trier of fact to understand the evidence or to determine a fact in issue.'") (quoting Fed. R. Evid. 702).

Dr. Nagourney's qualifications as an expert witness are not challenged. [DE 193 at 7898]. Dr. Nagourney's report and opinions are based on his examination of provided facts and evidence and rely upon his technical and specialized knowledge of LBB's to opine as to the cause of the May fires. Under Fed. R. Evid. 702 this is helpful to the trier of fact in determining whether Saft had manufactured or designed defective LBBs, key fact at issue regarding whether Ahtna could indemnify Saft for damages arising from the May event. The Court has already examined Daubert factors that Saft cumulatively alleges here and finds that they do not make Dr. Nagourney's opinion unreliable. Dr. Nagourney's opinions are helpful to the trier of fact and will not exclude them as unhelpful.

### 3. Vouching for Another Expert.

Saft alleges that the testimony in Dr. Nagourney's supplemental report is inadmissible under Fed. R. Evid. 703 as it's use of engineer Keith Thobe's report is merely "vouching for the truth of what another expert told him." [DE 144 at 1024]. Ahtna contends that Dr. Nagourney is not vouching for the testimony of another expert but is merely relying on the specialized knowledge of another expert as Fed. R. Evid. 703 contemplated. [DE 193 at 7904].

12

Courts have held that it is impermissible for an expert to simply parrot or act as a conduit for another person's opinion. *Gould Elecs., Inc. v. Livingston Cnty. Rd. Comm'n*, No. 17-11130, 2020 WL 6793335, at *8–9. (E.D. Mich. Nov. 19, 2020) (excluding the expert opinion of an which was entirely based on a non-testifying expert's analysis and who "did not describe in any significant way the facts or data upon which . . . conclusions rested or testify that those conclusions were the product of reliable principles and methods appropriately applied"). When, for instance, an expert is not qualified to offer an opinion but adopts the conclusions of others, that testimony will be excluded. *Brown v. Teledyne Cont'l Motors, Inc.*, No. 1:06-CV-00026, 2007 WL 838918, at *2–3 (N.D. Ohio Mar. 15, 2007).

> Experts are indeed not permitted to premise their opinion "entirely" on other experts without undertaking any of the necessary steps to form their own opinion. *See, e.g., In re Welding Fume Prods. Liab. Litig.*, No. 1:03-cv-17000, 2010 WL 7699456, at *63 (N.D. Ohio June 4, 2020). However, experts are permitted to rely on the opinions of other experts and such reliance is common. *See Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 613 (7th Cir. 2002). There is a difference between such reliance and someone simply testifying in order to vouch for another expert or act as their "spokes[person]." *Id.*

*In re Flint Water Cases*, No. 16-10444, 2023 WL 6147255, at *3 (E.D. Mich. Sep. 20, 2023).

Saft cites to several cases, including *Sigler v. Am. Honda Motor Co* and *CTS Corp.*, to support the proposition that Dr. Nagourney's use of another expert's data in his supplemental report is impermissible under Fed. R. Evid. 702. However, neither case shows that Dr. Nagourney's use of Keith Thobe's report is impermissible for an expert. In *CTS Corp.* the court ruled that "[t]he architect [the expert who did testify] could use what the engineer told him to offer an opinion within the architect's domain of expertise" but he could not "testify for the purpose of vouching for the truth of what the engineer had told him—of becoming in short the engineer's spokesman." *CTS Corp.*, 285 F.3d at 613; s*ee also TK–7 Corp. v. Est. of Barbouti*, 993 F.2d 722, 732 (10th Cir. 1993). In short, improperly vouching for the testimony of another expert has nothing

to do with using another expert's testimony as Saft claims, but rather forbids them from becoming a "mouthpiece of a scientist in a different specialty" by testifying in support of another expert without the knowledge or ability to do so properly as an expert. *CTS Corp*., 285 F.3d 614.

Federal Rule of Evidence 702 and 703 make clear that experts can rely on the data of others in certain circumstances. The drafters of the Federal Rules of Evidence "specifically contemplated that experts would rely on others with specialized knowledge.'" *Gonzalez v. Point Logistics, Inc*., No. 1:19-cv-27, 2021 WL 2697542, at *3 (W.D. Ky. June 30, 2021) (quoting *United States v. Stapleton*, No. 7:12-cr-11, 2013 WL5966122, at *9, (E.D. Ky. Nov. 8, 2013) (referencing Fed. R. Evid. 703 advisory comm. note)). So long as an expert does not "adopt another expert's opinions wholesale," *Siegel v. Fisher & Paykel Appliances Holdings Ltd., No*. 3:08CV-429-JDM, 2010 WL 4174629, at *2 (W.D. Ky. Oct. 19, 2010), pursuant to "'Rule 703, an expert's testimony may be formulated by the use of the facts, data and conclusions of other experts.'" *Asad*, 314 F. Supp. 2d at 740 (*citing Barris*, 685 F.2d at 102). Dr. Nagourney's usage of data from an engineer in his own supplemental report is nothing more than the use of data from a source with specialized knowledge, a practice contemplated and permitted by the Federal Rules of Evidence. The Motion to Exclude is **DENIED**.

## B.  Saft's Motion for Summary Judgement [DE 145]

Saft moves for summary judgment on Ahtna's last surviving third-party claim of implied indemnity (Count III).  [DE 70 at 485-86].  Count III alleges that Saft had a duty to ensure that its LBBs were free from defects and safe for their intended purpose.  [*Id.* at 485]. Specifically, Ahtna asserts that "Saft had a duty to design and manufacture its LBB battery management system that would fail safe and prevent exothermic failures that can result in fires." [*Id.*].  The Third-Party Complaint alleges that "[t]he LBBs designed and manufactured by Saft were defective for lack of

14

a battery management system to prevent exothermic failures, which caused Plaintiff's damages." [*Id.*]

Saft argues in its Motion for Summary Judgment that Ahtna attempts to shift liability for the damage sustained in this case to Saft, as the manufacturer of the of LBBs, asserting that a defect in the LBBs was the cause of the April overheating event which, in turn, created the necessity to remove the melted LBBs causing the May fire. [DE 145 at 1433]. Saft also argues that even if the LBBs were defective and Saft were a passive tortfeasor, Ahtna is still not entitled to indemnification because Ahtna is an active tortfeasor. [DE 145 at 1439]. And finally, Saft argues that even assuming it was an active tortfeasor, Ahtna was also actively negligent, and under Kentucky law, one active tortfeasor cannot seek indemnification from another active tortfeasor. [*Id.* at 1444]. Saft's second and third arguments both revolve around the same essential element, whether there is a genuine dispute of material fact as to Ahtna's status as an active tortfeasor. Accordingly, both can be resolved by deciding Ahtna's status as an active tortfeasor.

## 1. Standards

Under Federal Rule of Civil Procedure 56, summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). The essential inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 242.

The movant has the initial burden to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant,

who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256 (discussing Fed. R. Civ. P. 56(e)). "The court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Sagan v. United States,* 342 F.3d 493, 497 (6th Cir. 2003*)* (*citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

Both parties must support their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). Alternatively, either party may carry its burden by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B).

It is not enough for the nonmovant to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. Rather, the nonmovant must sufficiently allege a fact that, if proven, "would have [the] effect of establishing or refuting one of essential elements of a cause of action or defense asserted by the parties." *Midwest Media Prop., LLC v. Symmes Twp., Ohio*, 503 F.3d 456, 469 (6th Cir. 2007) (alteration in original) (*quoting Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)) (internal quotation marks omitted). If the nonmoving party does not respond with specific facts showing a genuine issue for trial, summary judgment is appropriate. *Emmons v. McLaughlin*, 874 F.2d 351, 353 (6th Cir. 1989).

## 2. Defective Design

First, Saft asserts that Ahtna cannot show that the LBBs were defectively designed or manufactured or that such defect was a substantial factor in causing the April Event or the May

Fire. Saft argues that while Dr. Nagourney suggests that a defect in Saft's LBBs is a possible cause of the April Event, he does not conclude that it is a "probable cause." [DE 145 at 1437]. Moreover, Saft asserts that Dr. Nagourney is "unable to exclude external reasons (*i.e.* those not attributable to the design or manufacture of the LBB) for the April Event." [DE 145 at 1438].  And because there are no materially disputed facts, Saft concludes that Ahtna cannot show the LBBs had a design defect and their claim for indemnity must fail.

This Court need not decide whether the LBB's are defective before deciding the issue of indemnity. *See Siegel v. Dynamic Cooking Sys.*, *Inc.*, 501 F. App'x 397, 406 (6th Cir. 2012). Kentucky law does not "preclude categorically the dismissal of an indemnity claim before primary fault has been determined." *Id*. Determining Ahtna's status as an active tortfeasor would be sufficient for a grant of summary judgment and dismissal of the indemnity claim against Saft.

However, there is a genuine dispute of material fact as to the issue of whether the LBB's were defectively designed that is sufficient to avoid summary judgment notwithstanding the determination of active tortfeasors. Given the denial of Saft's motion to exclude Dr. Nagourney's testimony, there is sufficient evidence such that a reasonable jury could determine that a defect did exist. Based on his report, Dr Nagourney states that a defect in the Saft LBBs "is the most probable explanation" for the May event [DE 144-1 at 308; Dr. Nagourney Dep. 30:18-19] and that the LBBs "were [defective] in that they failed to prevent a failure, or some issue with the design allowed that failure to occur." [*Id*. at 27:10-12]. Dr. Nagourney's report and deposition provide enough dispute to the material fact of whether the LBBs were defectively designed or manufactured. Since this fact is relevant in determining whether or not Ahtna could indemnify Saft for violating a duty to design safe and defect free LBB's, there is enough to survive summary

judgment when viewed in a light most favorable to the nonmoving party. *Sagan*, 342 F.3d at 497. Dr. Nagourney's testimony presents a sufficient disagreement to require submission to a jury.

### 3. Active Tortfeasor Status

Saft argues that regardless of whether this Court finds that the LBBs had been negligently designed or manufactured, indemnity is not proper as Ahtna itself is an active tortfeasor precluded from being indemnified under Kentucky Law. [DE 145 at 1436]. Saft claims that there are no material disputes of fact as to Ahtna's status as an active tortfeasor and summary judgement is proper. *Id*.   Because the status of Ahtna as an active tortfeasor is dispositive in a claim for indemnity, the Court will address this issue first, and it need not decide whether Saft qualifies as an active or passive tortfeasor.

Under Kentucky law, claims based on indemnity are "exceptions to the general rule, and are based on principles of equity." *Hall v. MLS Nat. Med. Evaluations, Inc.,* No. CIV A 05-185-JBC, 2007 WL 1385943, at *3 (E.D. Ky. May 8, 2007) (quoting *Degener v. Hall Contracting Corp.,* 27 S.W.3d 775, 780 (Ky. 2000)). Indemnity claims can only arise in two situations,

> (1) Where the party claiming indemnity has not been guilty of any fault, except technically, or constructively, as where an innocent master was held to respond for the tort of his servant acting within the scope of his employment; or
>
> (2) where both parties have been in fault, but not in the same fault, towards the party injured, and the fault of the party from whom indemnity is claimed was the primary and efficient cause of the injury.

*Louisville Ry. Co. v. Louisville Taxicab & Transfer Co.*, 256 Ky. 827, 77 S.W.2d 36, 39 (1934). The first of these two causes of indemnity does not apply as Ahtna is being sued directly for their own actions and there is no argument that they are being held liable due to an agency relationship. *Affiliated FM Ins. Co. v. RAM Constr. Servs. of Michigan, Inc*., No. CV 5:21-233-DCR, 2023 WL 322390, at *3 (E.D. Ky. Jan. 19, 2023)   The second does apply, and states that "a right to total

indemnity may exist if the joint tortfeasors are not in pari delicto and the party secondarily negligent asserts a claim against the one primarily negligent." *Lexington Country Club v. Stevenson*, 390 S.W.2d 137, 143 (Ky. 1965) (quoting *Brown Hotel Co. v. Pittsburgh Fuel Co.,* 311 Ky. 396 (1949)). In other words, a party cannot seek indemnity against another party if they too are an "active wrongdoer" or tortfeasor. *ISP Chemicals LLC v. Dutchland, Inc*., 771 F. Supp. 2d 747, 751 (W.D. Ky. 2011) (citing *Burton v. HO Sports Co*., No. 4:06CV-100-JHM, 2009 WL 1390832 (W.D. Ky. May 14, 2009)).

An active tortfeasor arises "where the primary tortfeasor created the hazard," while the "secondary tortfeasor simply failed to perform some legal duty, such as inspection or remedying a hazard." *Stanford v. United States*, 948 F. Supp. 2d 729, 745 (E.D. Ky. 2013) (citing *Brown Hotel Co., 311 Ky. 396*) ("[w]here one of two parties does an act or creates a hazard and" a second party, "while not concurrently joining in the act, is, nevertheless thereby exposed to liability . . . the party who was the active wrongdoer or primarily negligent can be compelled to make good to the other any loss he sustained."). Under Kentucky law there can be more than one active tortfeasor, and an active tortfeasor may not indemnify another active tortfeasor. *Dutchland, Inc*., 771 F. Supp. 2d at 751.

Saft argues that there is no genuine dispute of fact that shows Ahtna is anything other than an active tortfeasor, which would preclude indemnification. [DE 146 at 1439]. Ahtna disagrees, claiming that if they were found negligent it would be as a passive tortfeasor, and that Saft would be an active tortfeasor for creating the hazard posed by the LBBs. [DE 190 at 7342].

It is undisputed in this case that Ahtna was the employer of field engineers Thomas Owens, David Metcalfe, and Greg Hart. [DE 145 at 2139; SEL Exp. Rep. at 1]. It is further undisputed that during a teleconference Owens suggested using a sledgehammer and crowbar to unstick the

damaged batteries from the vault floor [DE 145-6 at 1777; Dep. H. Neal, at 87:6–24]. In response Owens was told this was unsafe [DE 145-7 at 1779; Dep. J. Paris, at 160:14– 161:25] and was instructed, in his own words, "many times" not to touch the LBB's. [DE 145-5 at 1775; Owens Dep. at 161:23–162:4; DE 145-7 at Paris Dep. at 69:3–8]. Finally, it is undisputed that on May 13, 2020, the three Ahtna field engineers entered Vault #2 where Owens attempted to dislodge the damaged LBBs with pry bars and sledgehammers, during which the LBB entered thermal runaway, causing a chain reaction with other LBB's that ignited the entirety of Vault #2. [DE 145-5 at 1773–74; Owens Dep. at 64:16–65:1; 145-3 at 1583; Nagourney Dep. at 126:6–23]

The facts of this case closely parallel the Kentucky state law case of *Greenwell v. Lowe's*. In *Greenwell* the court held that "the absence of a tether on the traffic light may have been a contributing cause of the accident, and Lowe's may have been negligent in so constructing the traffic light," as such both parties could be seen as "tortfeasors in pari delicto or active tortfeasors*." Id.* (quoting *City of Louisville v. Louisville Ry. Co.,* 156 Ky. 141 (1913)). However, there was "no scenario of provable facts" where Greenwell's purported negligence could be considered passive and entitled to indemnity. *Id*. In this, even if there were no dispute of fact regarding whether the LBB's were negligently designed, and even if this Court were to find that Saft was an active tortfeasor, Ahtna would still not be entitled to indemnity. Under the undisputed facts of this record, if Ahtna were to be found negligent for their actions, no reasonable fact finder could find that Ahtna was merely a passive tortfeasor.  Even if negligent construction was a contributing factor in the resulting harm, Ahtna's own actions, ignoring instructions and removing recently damaged and unstable LBB's with a crowbar and sledgehammer, go well beyond a failure to perform a legal duty to qualify as a passive tortfeasor. *Stanford*, 948 F. Supp. 2d at 745. Actively ignoring safety warnings and engaging in behavior despite those warnings creates an affirmative risk of harm and

20

qualifies as active negligence. *Id*. Thus, Ahtna's common law claim for indemnity against Saft must fail and Saft's Motion for Summary Judgement as to Ahtna's claim for implied indemnity is **GRANTED**.

### 4. Apportionment

Additionally, it is worth noting that Ahtna may have preserved their right to apportionment at trial. Ky. Rev. S.§ 411.182 "provides a right to an apportionment interrogatory or finding where underlying substantive fault exists, but it does not provide a substantive cause of action itself." *Hall,* 2007 WL 1385943, at *2; *Asher v. Unarco Material Handling, Inc.,* No. CIV.A.6:06-548-DCR, 2008 WL 2473680, at *3 (E.D. Ky. June 16, 2008*)*. Under Ky. Rev. S. 411.182(1) apportionment is possible against named parties and parties who settled under Ky. Rev. S. 411.182(4). If Ahtna's claim to indemnity is denied there will be no more claims against Saft since apportionment itself is no cause of action and Raytheon never brought a direct suit against Saft themselves. Saft would then be removed from this case. *Burton,* 2009 WL 1390832, at *2*. However, this does not preclude Ahtna from raising the issue of apportionment at trial to reduce damages if there is a finding that they are entitled to such an instruction. *Kevin Tucker & Associates, Inc. v. Scott and Ritter, Inc*., 842 S.W.2d 873 (Ky. App. 1992).

### III.   CONCLUSION

Having thus considered the parties' filings and the applicable law, and being otherwise sufficiently advised, the Court **ORDERS**:

1.   Saft's Motion to Exclude Testimony [DE 144] is **DENIED**.

2.   Saft's Motion for Summary Judgement [DE 145] is **GRANTED** and Saft is terminated as a party in this case.