UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

RAYTHEON COMPANY     Plaintiff

v.     Civil Action No. 3:21-cv-00239

AHTNA SUPPORT AND TRAINING SERVICES, LLC; AHTNA NETIYE', LLC; AHTNA, INCORPORATED; THOMAS M. OWENS     Defendants

## MEMORANDUM OPINION & ORDER

Plaintiff Raytheon Company ("Raytheon") moves to close the courtroom during trial pursuant to the International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. § 120, et seq., and the Export Administration Regulations ("EAR"), 15 C.F.R. § 730, et seq. [DE 245]. The motion is unopposed by the remaining parties to the litigation. [*Id.* at 10019]. For the reasons set forth below, Plaintiff's Motion to Close [DE 245] is **GRANTED.**

### I.     BACKGROUND

Raytheon is a contractor of aerospace and military defense equipment that operates a warehouse in Fairdale, Kentucky. [DE 1 at 1-3]. Raytheon contracted with the United States Government to support the Tube-Launched, Optically Tracked, Wireless-Guided (TOW) Missile (ITAS/MITAS) Program. [DE 245 at 10019]. At their Fairdale facility Raytheon maintains, stores, and services multiple mobile charging stations and storage locations for lithium-ion battery boxes ("LBBs") related to this Program. [DE 1 at 3]. The LBB's are owned by the government pursuant to military contracts. *Id*. Each LBB was stored within specially designed trailers commonly referred to as vaults. [DE 144 at 1006].

1

At issue in this case is Vault #2 which comprised an explosion proof container mounted on a tow trailer with shelves on each side containing LBBs connected to chargers. [DE 1 at 4]. Vault #2 was located on a loading dock at the Fairdale warehouse. *Id*. Ahtna agreed to provide qualified sustainment services and other necessary support to Raytheon, which included management and oversight of Vault #2. [*Id*. at 6].

On or about April 15, 2020, an over-heating ("exothermic") event occurred in Vault #2 at the Fairdale facility ("April Event"). [DE 144 at 1006]. Two military-grade LBBs overheated for unknown reasons. [*Id*.]. Those two LBBs suffered severe damage, and adjacent LBBs experienced minor secondary damage. [DE 1 at 6].

On May 13, 2020, Owens and two other Ahtna engineers, arrived at Vault #2 with instructions to take photographs of the damaged LBBs ("May Event"). [*Id*. at 7]. They began removing the two LBB's from the floor of the vault where they had melted and fused. [*Id*.]. After removing the first LBB, Owens and the other employees left for lunch, and returned to remove the second LBB. [*Id*.]. During their attempted removal, the second LBB began to emit sparks and smoke, before catching fire in a "thermal runaway event." [*Id*.]. The event spread to other LBBs in a "cascading thermal runaway." [*Id*.]. Raytheon claims the complete loss of 304 LBBs, Vault #2 itself, and $2,700,000 in fire-related damages and remediation costs among other things. [*Id*.].

Trial is scheduled for December 9, 2024, and Raytheon now moves unopposed to close public access to the trial.

## II.   STANDARD

The concept of the "consent of the governed" stresses the "public" nature of legal decisions and the open courtroom has been a fundamental feature of the American judicial system. *Brown & Williamson Tobacco Corp. v. F.T.C.*, 710 F.2d 1165, 1178 (6th Cir. 1983). In *Richmond*

*Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980), the Supreme Court elaborated on the underpinnings of the right of access. There the trial court had closed the proceedings to the press and public on the defendant's motion, and without objection from the prosecution, on the ground that jurors would improperly obtain information through the media. Reversing the trial court, the Supreme Court in *Richmond Newspapers* found that the public right of access applies to trials primarily because of the long history of open courtrooms. The Supreme Court's analysis of the justifications for access to a criminal trial apply as well to the civil trial. *Brown & Williamson Tobacco Corp.,* 710 F.2d at 1178 (quoting *Richmond Newspapers,* 448 U.S. at 599 (J. Stewart, concurring)) ("the First and Fourteenth Amendments clearly gives the press and the public a right of access to trials themselves, civil as well as criminal."); *see also Gannett Co. v. DePasquale,* 443 U.S. 368, 386 n. 15 (1979).

While closing the courtroom is in tension with the "presumption of openness" favoring public trials, *United States v. Simmons*, 797 F.3d 409, 413 (6th Cir. 2015) (quoting *Waller v. Georgia*, 467 U.S. 39, 46 (1984)), "the right to an open trial may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information." *Waller,* 467 U.S. at 46. Only rare circumstances justify courtroom closures and "the balance of interests must be struck with special care." *Waller*, 467 U.S. at 44–45

Exceptions to maintaining an open courtroom fall into two general categories: (1) exceptions premised on the necessity to maintain order and dignity in the courtroom; and (2) exceptions based on the content of the information that may be disseminated to the public.

The first type of exception is addressed in *Richmond Newspapers,* where the Supreme Court noted that "a trial judge, in the interest of the fair administration of justice, [may] impose

3

reasonable limitations on access to a trial . . . [i]t is far more important that trials be conducted in a quiet and orderly setting than it is to preserve that atmosphere on city streets." 448 U.S. at 581 n. 18. This type of exception must pass a three-part test: (1) that the regulation serves an important governmental interest; (2) that this interest be unrelated to the content of the information to be disclosed in the proceeding; and (3) that there be no less restrictive way to meet that goal. *See United States v. O'Brien,* 391 U.S. 367, 377 (1968). "These limitations on access, such as regulating the number of spectators or the use of flashbulbs or cameras, have been accepted in many instances as based on the legitimate societal interest in protecting the adjudicatory process from disruption." *Brown & Williamson Tobacco Corp.*, 710 F.2d at 1179.

The second type of exception to maintaining open court proceedings are "content-based exceptions to the right of access [that] have been developed to protect competing interests." *Brown & Williamson Tobacco Corp.*, 710 F.2d at 1179. These interests include significant privacy rights of participants or third parties, trade secrets, and national security. *Id.* (citing *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 598 (1978) and Note, *Trial Secrecy and the First Amendment Right of Public Access to Judicial Proceedings,* 91 Harv.L.Rev. 1899 (1978)). To balance these interests the Supreme Court articulated the four-factor *Waller* Test:

> (1) the party seeking to close a public hearing must advance an overriding interest that is likely to be prejudiced, (2) the closure must be no broader than necessary to protect that interest, (3) the trial court must consider reasonable alternatives to closing the proceeding, and (4) it must make findings adequate to support the closure.

*Waller,* 467 U.S. at 48. This is the exception pursued by Raytheon.

Nearly all federal courts of appeals distinguish the total closure of proceedings from situations in which a courtroom is only partially closed to certain spectators. *Garcia v. Bertsch,* 470 F.3d 748, 752 (8th Cir. 2006) ("Many courts . . . have distinguished the complete closure in

4

*Waller* from partial closures."). "Whether a closure is total or partial . . . depends not on how long a trial is closed, but rather who is excluded during the period of time in question." *United States v. Thompson,* 713 F.3d 388, 395 (8th Cir. 2013). A total closure involves excluding all persons from the courtroom for some period or the entire case while a partial closure involves excluding one or more, but not all, individuals for some period. *Judd v. Haley,* 250 F.3d 1308, 1316 (11th Cir. 2001). Where a partial closure is sought, the *Waller* test is modified so that the "overriding interest" requirement is replaced by requiring a showing of a "substantial reason" for a partial closure, but the other three factors remain the same. *United States v. Simmons*, 797 F.3d 409, 414 (6th Cir. 2015). Here, Raytheon seeks a total closure, and the higher burden prevails.

"With the scales thus tipped dramatically in favor of open proceedings, a trial court must explain in detail its reasoning for closing the courtroom, including whether it considered alternative measures, and how it narrowly tailored the remedy it is imposing to achieve the specific interests it seeks to protect." *Williams v. Burt*, 949 F.3d 966, 975–76 (6th Cir. 2020) (citing *Simmons*, 797 F.3d at 413).

### III. ANALYSIS

**1. Overriding Government Interest Likely To Be Prejudiced.**

"To protect national security and avoid unlawful disclosure of technical data protected under ITAR and EAR, Raytheon requests that the Court close the courtroom when export-controlled documents are being displayed or discussed in testimony or argument." [DE 245 at 10030]. As grounds for the Motion to Close, Raytheon asserts that:

> As part of the TOW ITAS/MITAS weapons system, the LBBs and much of the documentation and information relating thereto, are subject to ITAR and EAR restrictions. Pursuant to these regulations, export-controlled-restricted information may not be exported, reexported, temporarily imported, transferred, or retransferred to any person, country, or entity, by any means, without the appropriate approval of the U.S. Department of State, Directorate of Defense Trade Controls for ITAR or the U.S. Department of Commerce, Bureau of Industry and Security for EAR. Thus, export-controlled documents, information, material, and testimony may only be disclosed to U.S. persons. Violations of these regulations can be the subject of hefty civil fines. Willful release of information in violation of the regulations could even subject the violator to criminal penalties of up to $1,000,000 and imprisonment for not more than 20 years, or both. Case 3:21-cv-00239-RGJ-RSE Document 245 Filed 10/23/24 Page 2 of 14 PageID #: 10020 3 See 22 U.S.C. § 2778(c) (ITAR); 22 C.F.R. 127.3(b) (ITAR); 50 U.S.C. § 4819(b) (EAR); 15 C.F.R. § 764.3(b) (EAR).

[DE 245 at 10021]. In the context of discovery in this case, this Court has already recognized the national security implications of ITAR and EAR controls in granting Raytheon's Motion for Protective Order. [DE 61]. As the Court noted, "in assessing [a] claim that disclosure may harm national security, courts must exercise the traditional reluctan[ce] to intrude upon the authority of the Executive in military and national security affairs." [*Id.* at 4-5 (quoting *United States v. Zubaydah*, 142 S. Ct. 959, 967 (2022)].

The same overriding interest exists here at the trial stage to avoid violations of export control regulations and protect national security. Both ITAR and EAR serve an overriding government interest in bolstering national security by restricting the dissemination of military technology. The statutes and regulations expressly recognize that interest. And they restrict disclosure of export-controlled information about that military technology to non-U.S. persons to protect national security. Simply put, the disclosure of ITAR or EAR-protected documents during trial would undermine national security and be unlawful.

As a result, there is an overriding national security interest to close the courtroom to avoid export control violations.

### 2. Breadth of Closure and Consideration of Alternatives.

Raytheon seeks a total closure "when export-controlled documents are being displayed or discussed in testimony or argument." [DE 245 at 10030]. Additionally, while Raytheon requests "that the transcripts of the proceedings remain under seal, it does not object to the release of the transcripts of the proceedings after an opportunity to review for any necessary redactions for ITAR- or EAR-protected technical information about the LBBs." [*Id.* at 10024].

First, as to the total or partial closure, the Court agrees that the courtroom must be closed to all individuals because of the nature of material and legal prohibition regarding non-U.S. persons. The court has considered methods of screening individuals permitted into the courtroom; however, this is also unworkable given the need for on-the-spot determinations of citizenship. There is simply no way the court could adequately screen individuals wishing to spectate. As a result, and after considering reasonable alternatives, the Court finds the total closure necessary and narrowly tailored to the interests at issue.

The Court notes that Raytheon requests in its motion total closure "when export-controlled documents are being displayed or discussed in testimony or argument," [DE 245 at 10030], but additionally appeared to request total closure for the *entirety* of the trial at the final pretrial conference. In responding to the Court's questions at the final pretrial conference, Raytheon asserted that the court could not order a total closure during the testimony of some witnesses but not all witnesses because of the pervasive nature of the materials. Raytheon expressed concerns that closing the courtroom only for select witnesses may substantially limit its ability to present its case.

At this stage of the proceeding, the Court notes that the material at issue does appear to be pervasive. ITAR- and EAR-protected information is prevalent in the materials, pleadings,

exhibits, and topics which will be discussed throughout trial. Nearly every facet of the case from the contract at issue to the technical specifications of the subject matter of the lawsuit, the LBBs, touches upon ITAR- and EAR-protected materials. While the court has considered whether the ITAR- and EAR-protected materials could be limited to closure for certain witnesses or portions of the trial, a review of the motion practice and the representations of the parties leads to the conclusion that it may not be possible. Nearly every pleading in this case has some redactions or need for seal, and ITAR- and EAR-protected materials would be intertwined in the testimony of both experts and fact witnesses. As such, limiting the closure to only certain witnesses or topics may not be possible. At this time, it is unclear what portion, if any, of the trial could be open, i.e., what portion of the trial would not implicate the potential disclosure of ITAR- or EAR-protected information. As a result, the Court will order that there will be a total closure "when export-controlled documents are being displayed or discussed in testimony or argument," but the parties will need to further clarify what portion of the trial, if any, may be open to the public.

As to the transcript, while Raytheon requests "that the transcripts of the proceedings remain under seal, it does not object to the release of the transcripts of the proceedings after an opportunity to review for any necessary redactions for ITAR- or EAR-protected technical information about the LBBs." [*Id.* at 10024]. The Court finds this ability to provide redactions appropriately balances of interests of the parties and the public. *Press-Enter. Co. v. Superior Ct. of California, Riverside Cnty.*, 464 U.S. 501, 512 (1984) ("When limited closure is ordered, the constitutional values sought to be protected by holding open proceedings may be satisfied later by making a transcript of the closed proceedings available within a reasonable time, if the judge determines that disclosure can be accomplished while safeguarding the juror's valid privacy interests."). As a

result, the transcripts will remain under seal for 30 days to provide the parties an opportunity to make redactions.

## IV.   CONCLUSION

Having thus considered the parties' filings and the applicable law, and being otherwise sufficiently advised,

**IT IS ORDERED** that Plaintiff's Motion to Close [DE 245] is **GRANTED.**

**IT IS FURTHER ORDERED** that the courtroom will remain closed to all persons "when export-controlled documents are being displayed or discussed in testimony or argument."

**AND IT IS FURTHER ORDERED** that all trial transcripts will remain under seal for 30 days in order to provide the parties an opportunity to make redactions, after which time the transcripts will be made public.

November 21, 2024

Rebecca Grady Jennings, District Judge
United States District Court

Cc:  Court Reporter, April Dowell
     Jury Administrator
     U.S. Marshals

9